In re ENERGY SYSTEMS EQUIPMENT
LEASING SECURITIES LITIGATION.

No. MDL–637.

United States District Court,
E.D. New York.

Aug. 5, 1986.

Goodkind, Wechsler, Labaton & Rudoff By Joseph Steinberg, New York City, Sachnoff, Weaver & Rubenstein, Ltd. By Fay Clayton, Chicago, Ill., co-lead counsel for plaintiffs; Shea & Gould By Richard Spinogatti, New York City, Lord, Bissell & Brook By David D. McLaughlin, Chicago, Ill., co-lead counsel for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This litigation, consisting of seven cases consolidated before this Court for purposes of all pretrial and discovery proceedings pursuant to 28 U.S.C. § 1407 and an Order of the Judicial Panel on Multidistrict Litigation,[1] arises out of the lease and sale of energy conservation systems, allegedly designed for the primary purpose of providing tax shelters to investors. In accordance with the Court's Orders, plaintiffs have filed a single Consolidated Class Action Complaint ("Consolidated Complaint") covering five of these cases.[2] Additionally, there are before the Court the individual complaints filed in the two remaining cases, *Duco v. OEC Leasing Corp.* and *Horn v. OEC Leasing Corp.*,[3] which, although in front of this Court for all pretrial and discovery matters, will ultimately be returned for trial to the forums in which they were originally commenced.[4] The Court now must consider motions to dismiss filed by a number of the defendants and plaintiffs' motion for class certification.

## I. FACTUAL BACKGROUND

### A. *The Basic Scheme*

For the purposes of deciding the motions currently pending, the Court must take as true the facts alleged by plaintiffs in the complaints. In considering a motion to dismiss, a court must view the material allegations of a complaint, along with such reasonable inferences as might be drawn in the plaintiffs' favor, as admitted. *Garguil v. Tompkins*, 704 F.2d 661 (2d Cir.1983), *vacated on other grounds*, 465 U.S. 1016, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984); *Murray v. City of Milford*, 380 F.2d 468 (2d Cir.1967). A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Furthermore, when a defendant seeks to dismiss a complaint, the court is restricted to evaluating the legal sufficiency of the pleadings. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The motion is addressed to the face of the pleadings and the court may look only within the four corners of the complaint or to statements or documents attached as exhibits to or clearly incorporated by reference in the pleadings. Fed.R. Civ.P. 10(c); *Goldman v. Belden*, 754 F.2d 1059 (2d Cir.1985); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774 (2d Cir.1984).

---

**1.** The seven cases are: *Waites, et al. v. First Energy Leasing Corp., et al.*, No. CV 85–1316; *Kahler v. First Energy Leasing Corp., et al.*, No. CV 85–1318; *Simlar, et al. v. First Energy Leasing Corp., et al.*, No. CV 85–2170; *Duco, Inc., et al. v. OEC Leasing Corp., et al.*, No. CV 85–2171; *Falcone v. OEC Leasing Corp., et al.*, No. CV 85–2282; *Berlage, et al. v. OEC Leasing Corp., et al.*, No. CV 85–2387; and *Horn, et al. v. OEC Leasing Corp., et al.*, No. CV 85–3692.

**2.** The Consolidated Complaint covers *Waites*, No. CV 85–1316; *Kahler*, No. CV 85–1318; *Simlar*, No. CV 85–2170; *Falcone*, No. CV 85–2282; and *Berlage*, No. CV 85–2387.

**3.** No. CV 85–2171 and No. CV 85–3692, respectively.

**4.** *Duco* was originally filed in the Northern District of Georgia, Atlantic Division, while *Horn* was originally commenced in the Southern District of Ohio, Eastern Division. *Waites* and *Kahler* were transferred from the Northern District of Illinois, Eastern Division, *Simlar* and *Berlage* from the Western District of Michigan, Southern Division. *Falcone* was commenced in the Eastern District of New York.

A complaint's substantive allegations must also be accepted as true upon consideration of a class certification motion. *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). A court may not examine the merits of plaintiffs' claims when deciding such a motion. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *In re Scientific Control Corp. Securities Litigation*, 71 F.R.D. 491 (S.D.N.Y.1976); *Steinmetz v. Bache & Co.*, 71 F.R.D. 202 (S.D.N.Y.1976).

Plaintiffs allege that the defendants in the consolidated cases jointly developed, participated in, and aided and abetted a sophisticated nationwide tax shelter scheme which systematically defrauded investors of tens of millions of dollars. Plaintiffs allege that defendants grossly inflated the fair market value of so-called "Energy Control Systems" ("Systems") through a series of sham sales transactions entered into among affiliated defendants. The Systems are essentially electronic switches which can turn electricity on or off according to a schedule established by a user. Defendants valued the systems at prices ranging, depending on the specific System, between $65,000 and $280,000. Other defendants then supplied "expert opinions" purporting to support the claimed value of the Systems.

The Systems were marketed to investors as tax shelters. Essentially, the investor would purchase what plaintiffs define as an "investment contract" security consisting of two separate agreements. The investor would enter into a long term lease agreement with one of the promoter defendants. The investor also had the option of signing a service agreement with another defendant company, often operated by the same individuals who controlled the promoter defendants, which would undertake to locate an appropriate end-user of the leased energy conservation device and install and maintain the System. Plaintiffs allege that defendants led investors to believe that leasing of the Systems would entitle them to large investment tax credits and depreciation deductions based upon the stated market value of the Systems. Furthermore, investors were led to believe that additional financial gains would result from a revenue sharing arrangement with regard to a large income stream that was to be generated by the energy savings which an end-user would purportedly achieve upon installing the System.

Plaintiffs claim that, in reality, the Systems are worth, at most, $3,000 apiece, and are totally incapable of generating an income stream even remotely approximating that which defendants represented would be available. The Internal Revenue Service has notified numerous investors that the claimed investment tax credit will be challenged and in fact already disallowed the tax shelter claimed by certain investors. The United States Department of Justice has instituted litigation on behalf of the Internal Revenue Service against several of the defendants, including a lawsuit currently pending in this Court.[5] The Attorney General of the State of New York is also currently investigating the alleged scheme.[6] Moreover, according to plaintiffs, the vast majority of the Systems has yet to be delivered or installed in an end-user's premises, and plaintiffs are unaware of any System which has been installed and is currently functioning in a manner consistent with the representations contained in defendants' offering materials and related documents.

**5.** *United States v. OEC Leasing Corp., Franklin New Energy Corp., William Medina and Frank Giuffrida*, No. CV 84–4112. Franklin New Energy Corp. and Frank Giuffrida have in turn filed a suit against the government seeking an injunction barring the assessment and collection of any tax penalties and a declaration that any such penalties are null and void. *Franklin New*

*Energy Corp. and Frank Giuffrida v. United States*, No. CV 86–1395.

**6.** *In the Matter of an Inquiry by the Attorney General of the State of New York Pursuant to Article 23–A of the General Business Law in Regard to the Practices of First Energy Leasing Corporation, et al.*, No. 41457/84 (N.Y.Sup.Ct.N.Y.Co.).

The various complaints filed in the actions consolidated before the Court designate a multitude of individuals and companies as parties to the litigation. Additionally, although there is a significant overlap between the defendants named in the Consolidated Complaint and the complaints filed in the *Duco* and *Horn* actions (*"Duco* Complaint" and *"Horn* Complaint," respectively), the named defendants in each of the actions are not completely identical. Furthermore, the complaints vary to some degree in the specific claims alleged. Accordingly, the Court will separately discuss the particular parties named and counts contained in each of the three complaints.

### B. *Parties*

#### 1. *Consolidated Complaint*

##### a. *Defendants*

Defendants First Energy Leasing Corporation ("FELC") and OEC Leasing Corporation ("OEC") issued and promoted the System investment securities at issue in this litigation. First American Capital Corporation ("First American") allegedly provided FELC and OEC with their initial capitalization, office space, telephones, furniture, and overhead expenses. Plaintiffs contend that due to its controlling relationship with FELC and OEC, First American also constitutes an issuer and promoter of the System investment securities.

James Marci was the sole shareholder and President of FELC, Salesman Vice President of OEC, and an officer and President of First American during the periods relevant to the litigation. Jerome Cadden was a Vice President of FELC. Lee Rosenberg was FELC's Vice President, Marketing and appeared on a videotape used to promote the sale of the Systems. Mark Williams was a salesman for FELC. William Medina was President and a major stockholder of OEC. Additionally, Medina was an organizer, along with Frank Giuffrida, of defendant Franklin New Energy Corporation, ("FNEC"), which supplied Systems to OEC and possibly FELC. Guiffrida was FNEC's President and a major stockholder of that company. Michael En-

den and Kenneth Carstow were OEC Vice Presidents. John Oster was an OEC employee.

Irwin Berman has been President of First American since December, 1983. Furthermore, at all times relevant to this litigation, Berman was a director and 20% shareholder of defendant Encon Enterprises, Inc. ("Encon"), which supplied equipment, including Systems, to FELC. Berman organized Encon along with defendants Lee Tobin, John DeRaffele, Estelle Cleary, and Virginia Marci, the wife of James Marci. Tobin was President of Encon, as well as a director of the company and a 20% shareholder. DeRaffele was Encon's Secretary, a director, and a 20% shareholder. Cleary and Virginia Marci were each directors and 20% shareholders of the company.

Besides FNEC and Encon, plaintiffs also name as defendants three other companies that purportedly supplied Systems and other equipment to FELC and OEC, at least indirectly. Plaintiffs allege that Energy Minder Corporation ("Energy Minder") supplied equipment to FNEC, which in turn resold it to OEC and possibly FELC to be leased to investors. Vanguard Energy Conservation Products, Inc. ("Vanguard") contracted to supply equipment to Encon, which in turn contracted to resell the equipment to FELC. Eckard Engineering, Inc. ("Eckard Engineering") designed and supervised the assembly of Systems for FNEC, Encon, and Vanguard.

Plaintiffs contend that DeRaffele and Robert Cleary, the husband of Estelle Cleary, control Energy Minder, either directly or indirectly. William Eckard was and is one of two controlling shareholders of Vanguard. Eckard was similarly one of two controlling shareholders of Eckard Engineering until December 1984, when he became the sole shareholder of that company. Neil Chapman was employed by Eckard Engineering at all times relevant to these consolidated actions and supervised the assembly of Systems for Vanguard and Eckard Engineering.

Plaintiffs name as defendants a number of companies who entered into service agreements with investors and therefore, according to plaintiffs, qualify as issuers and promoters of the Systems securities. Control Technology, Inc. ("Control"), Weatherman Energy Management Energy Control Corporation ("Weatherman"), Allstate Service Company, d/b/a Allboro Energy Control Corporation ("Allstate"), Miken Controls, Inc. ("Miken"), Enerpak ("Enerpak"), Dodge Electric ("Dodge Electric"), Energy Savings Systems, Inc. ("ESS"), Precision Company ("Precision"), Niles EMS ("Niles"), Minuteman ("Minuteman"), Delaware Valley Management Systems ("Delaware"), and Temperature Technologies, Inc. ("Temperature Technologies") are each alleged to have entered into such agreements. Plaintiffs also claim that Control contracted with Eckard Engineering,[7] FNEC, and Vanguard to furnish OEC with Systems.

Lee Tobin, in addition to his relationship with Encon, was President and a major stockholder of Weatherman. John DeRaffele, in addition to his involvements with Encon and Energy Minder, was President and a major stockholder of Control, and a general partner of Allstate. Robert Cleary was apparently similarly involved not only with Energy Minder, but with Control and Allstate as President and a general partner, respectively.[8] Plaintiffs also allege that one Jack Nelson, an executive employee of Weatherman who has not been named as a defendant, appeared on the videotape used to promote the sale of Systems.

Plaintiffs name as defendants several "experts", including accountants, lawyers, and engineers, who purportedly provided reports and opinions relating to the energy conservation devices, the promoting companies, and the validity of the lease of the

offered equipment as a tax shelter and potential income source.

Defendant Spierer, Woodward, and Holguin ("Spierer, Woodward") served as tax counsel to FELC and James Marci. Spierer, Woodward allegedly issued a tax opinion dated August 16, 1983 that FELC and Marci used in promoting and selling the System securities which are the subject of this litigation. Moreover, Steven Spierer, one of the partners in Spierer, Woodward, appeared in the videotape used to promote the investment securities.

Defendant Bernstein, Bernstein, Bernstein, Stein, Rush ("the Bernstein firm") is a law firm that served as tax counsel to OEC. Plaintiffs have also sued Zayle Berstein, the senior partner of the Bernstein firm, in his individual capacity. Zayle Bernstein was Vanguard's other controlling shareholder and, until December 1984, also a controlling shareholder of Eckard Engineering. Defendant Grossman & Flask also served as tax counsel to OEC.

Defendant Touche Ross & Company ("Touche") is a partnership engaged in the practice of public accounting. Touche performed accounting services for FELC and James Marci, including the preparation of statements used by FELC and James Marci in promoting and selling the System securities. Furthermore, Touche, through Eric Hananel, a partner in the accounting firm who is also named as an individual defendant, participated in the promotion and sale of the securities by appearing on the videotape used to promote sales. As part of this videotape, Hananel, on behalf of Touche, commented favorably upon the securities. Defendant Stuart H. Becker & Company ("Becker") is also engaged in the practice of public accounting and allegedly supplied to FELC for use in promotion and sale of

---

7. Actually, plaintiffs allege that Control contracted with Eckard. Consolidated Complaint ¶ 45. The Court assumes that plaintiffs intend to refer to the company Eckard Engineering, rather than individual defendant William Eckard, who had links with both Eckard Engineering and Vanguard.

8. Plaintiffs have alleged that both DeRaffele and Robert Cleary were Presidents of Control and general partners of Allstate at all times relevant to this litigation. Consolidated Complaint ¶¶ 72, 75. It may also be worthy of note that Berman, Tobin, DeRaffele, Estelle Cleary, and Virginia Marci were each 20% shareholders of First American, which purportedly controlled FELC and OEC.

the securities the same information contained in Touche's statements.

Defendant Guaranteed Energy Management Systems, Inc. ("GEMS") provided FELC with a technical and financial analysis of the Systems dated November 18, 1983. FELC used this analysis in its promotion and sale of the System securities. Defendant Jose Chavez was the President and major shareholder of GEMS during all times relevant to this action.

A number of engineering firms and individual engineers are also included among the "expert" defendants. Defendant Systems Planning Corporation ("SPC"), along with its wholly owned subsidiaries, defendants Daverman Associates, Inc. ("Daverman"), and Greiner Engineering Sciences, Inc. ("Greiner"), allegedly provided to FELC a technical analysis that FELC used in promoting and selling the securities which are the subject of this litigation. Defendants William Barrett and Thomas Chen are professional engineers employed by Daverman. Defendant Allan A. Kozich, a professional engineer doing business as Allan A. Kozich & Associates (collectively, "Kozich"), allegedly provided FELC with a technical analysis containing numerous false and misleading statements. Defendant John W. Peterson is a professional engineer who also allegedly provided FELC with a technical analysis that FELC used in promoting and selling the securities.

Defendants Day & Zimmerman, Inc. ("Day & Zimmerman"), Viron Corporation ("Viron"), and Fluor Engineers, Inc. ("Fluor") each purportedly provided to OEC, for distribution to investors, a technical or financial analysis of the Systems leased by OEC to investors. These analyses were in turn provided to investors as part of OEC's offering materials and documents. Defendant Nicholas Arteca is a professional engineer who also provided a technical analysis to OEC which was then provided to investors as part of OEC's offering material and documents.[9]

9. ¶ 93 of the Consolidated Complaint sets forth in chart form a summary of what plaintiffs deem to be the more significant affiliations and controlling relationships among the defendants:

| Name of Defendant | Nature of Control Relationship | Controlled Entity |
|---|---|---|
| J. Marci and wife V. Marci | V. Marci, 20% shareholder and director | First American |
| | J. Marci, Former President | First American |
| | V. Marci, 20% shareholder and director | Encon |
| | J. Marci, President and sole shareholder | FELC |
| | J. Marci, Vice President and salesman | OEC |
| | V. Marci, 20% shareholder of First American | OEC |
| | V. Marci, 20% shareholder of First American | FELC |
| Lee Tobin | 20% shareholder and director | First American |
| | 20% shareholder and director | Encon |
| | President and shareholder | Weatherman |
| | 20% shareholder of First American | OEC |
| | 20% shareholder of First American | FELC |

### b. *Plaintiffs*

The Consolidated Complaint designates nine individual plaintiffs as proposed class representatives, each of whom entered into lease and service agreements concerning one or more Energy Control Systems. Plaintiffs Donald Simlar and George Dudek each purchased an investment contract consisting of a lease agreement with FELC and a service contract with Control regarding one System. The contracts called for Simlar and Dudek each to pay FELC a prepaid lease fee of $5,000 and Control a prepaid fee of $1,500 plus subsequent additional fees. Plaintiff Paul Maciejewski entered into similar agreements with FELC and Weatherman. Plaintiff Bruce E. Kahler contracted with FELC and Weatherman regarding the lease and service of six Sys-

| | | |
|---|---|---|
| John DeRaffele | 20% shareholder and director | First American |
| | 20% shareholder, secretary and director | Encon |
| | Major shareholder and officer | Control |
| | General Partner | Allstate |
| | 20% shareholder of First American | OEC * |
| | 20% shareholder of First American | FELC |
| | Major shareholder | Energy Minder |
| Irwin Berman | 20% shareholder, President and director | First American |
| | 20% shareholder and director | Encon |
| | 20% shareholder of First American | FELC |
| | 20% shareholder of First American | OEC |
| R. Cleary and wife E. Cleary | E. Cleary, 20% shareholder and director | First American |
| | E. Cleary, 20% shareholder and director | Encon |
| | R. Cleary, major shareholder | Energy Minder |
| | R. Cleary, general partner | Allstate |
| | R. Cleary, President and major shareholder | Control |
| | E. Cleary, 20% shareholder of First American | OEC |
| | E. Cleary, 20% shareholder of First American | FELC |
| William Medina | President and major shareholder | OEC |
| | Incorporator | FNEC |
| Frank Giuffrida | President and major shareholder | FNEC |
| Zayle Bernstein | Senior Partner | Bernstein Firm |
| | 50% shareholder | Vanguard |
| | Former 50% shareholder (prior to December 1984) | Eckard Engineering |
| | Tax counsel, through Bernstein firm | OEC |
| William Eckard | 50% shareholder | Vanguard |
| | Former 50%, now 100% shareholder (subsequent to December 1984) | Eckard Engineering |

tems, while plaintiff William E. Waites entered into agreements with these companies concerning two Systems. Kahler's agreements called for the payment of a $30,000 prepaid lease fee to FELC and a prepaid fee of $1,500 and subsequent additional fees to Weatherman. Waites was required to prepay $10,000 to FELC and $3,000 to Weatherman, plus subsequent additional fees.

Plaintiffs Donald J. Berlage, Donald Krick, and Michael Burnham entered into similar arrangements with OEC and Weatherman. Berlage leased three Systems and contracted to prepay OEC $15,-000 and Weatherman $5,250; Krick leased one System under a contract calling for prepaid fees of $5,000 and $1,750 to these two companies, respectively; Burnham leased one System under an agreement calling for prepaid fees of $9,000 and $2,150. Plaintiff Anthony Falcone leased one System and agreed to prepay $15,000 to OEC and $1,750 to Control, plus subsequent additional fees.

### 2. *Duco Complaint*

#### a. *Defendants*

The *Duco* Complaint names as defendants OEC, Medina, Arteca, Control, Robert Cleary, Weatherman, Tobin, Zayle Bernstein, the Bernstein firm, and Eckard Engineering. The complaint additionally names two individuals not designated as parties in the Consolidated Complaint. George Lemonides, deemed an "Appraiser Defendant," purportedly drafted an opinion letter, used in the promotion and sale of the Systems, regarding the fair market value of and energy savings that would be generated by the Systems without undertaking any independent analysis or otherwise having an adequate basis for his conclusions. Larry Kars is an attorney who issued a tax opinion to OEC and Medina.

#### b. *Plaintiffs*

The *Duco* Complaint names seven plaintiffs: Duco, Inc., Lee Fair, Inc., Keico Enterprises, Inc., A.W. Adams, Paul R. Bradley, John T. Dobson, and Donald F. Trousdell. Each of the plaintiffs entered into a lease agreement with OEC and paid an advance fee of $5,000. Each plaintiff also entered into a service agreement with either Control or Weatherman and prepaid a $1,000 fee.

### 3. *Horn Complaint*

#### a. *Defendants*

The *Horn* Complaint names OEC, Medina, FNEC, Control, Robert Cleary, Zayle Bernstein, the Bernstein firm, Day & Zimmerman, Weatherman, Tobin, Fluor, Touche, and Viron as defendants. Additionally, the complaint names not only the law firm of Grossman & Flask, which is designated as a defendant in the Consolidated Complaint, but also Robert D. Grossman, Jr., a partner in the firm. Conversely, the *Horn* Complaint names not only Nicholas Arteca, a professional engineer, but also the engineering firm of Nicholas Arteca, Inc. Like *Duco*, *Horn* deems George Lemonides and Larry Kars party defendants, although the *Horn* Complaint not only designates Larry Kars an individual defendant, but also names his law firm, Larry Kars, P.C. The *Horn* Complaint also names E. Ross Forman, Wade W. Larkin, and Vern Hopkins, engineers employed by Day & Zimmerman, Fluor, and Viron, respectively. Finally, *Horn* names two other engineering firms, Henry W. Kuklinski Enterprises, Inc. and Western Time Corporation, as well as Henry W. Kuklinski, a professional engineer with the former company, and M.C.R. McKenzie, a professional engineer with the latter.

#### b. *Plaintiffs*

The *Horn* Complaint names seventy one plaintiffs who purchased the investment contracts. Plaintiffs entered into lease agreements with OEC and Medina, paying varying sums, and into service agreements with Robert Cleary, Control, Tobin, or Weatherman, paying additional sums.

## II. COUNTS OF THE COMPLAINTS

### A. *Consolidated Complaint*

The Consolidated Complaint sets forth twelve separate counts, six against each of two basic categories of defendants, *i.e.*,

those whom plaintiffs designate as "FELC Defendants" and those designated "OEC Defendants." The FELC Defendants include, in addition to FELC itself, (a) the other "FELC Promoters:" First American and those defendants identified as organizers, principals, shareholders, and employees of FELC and First American; (b) the "FELC Suppliers," namely, Encon, FNEC, Vanguard, and Eckard Engineering and each of the defendant employees of these companies; (c) Daverman, Touche, Becker, GEMS, Spierer, Woodward, Kozich, and Peterson, and each of their defendant employees and principals, whom plaintiffs deem "FELC Experts." The "OEC Defendants" consist of OEC and (a) the other "OEC Promoters," *i.e.*, First American and those defendants identified as organizers, principals, shareholders, and employees of OEC and First American; (b) the "OEC Suppliers," namely, FNEC, Vanguard, Eckard Engineering, and Energy Minder;[10] (c) "OEC Experts" Arteca, the Bernstein firm, Zayle Bernstein, Grossman & Flask, Day & Zimmerman, Viron, and Fluor, and each of the defendant employees of the companies within this category. The "Service Company Defendants"[11] are included as both FELC and OEC Defendants.

Count I of the Consolidated Complaint alleges that the FELC Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), by either preparing, conspiring to prepare, or aiding and abetting one another in the joint preparation of offering materials and related documents which contained untrue statements and omissions of material facts. These misstatements and omissions were allegedly made either knowingly or in reckless disregard of the truth.

Count II of the Consolidated Complaint alleges that the FELC Defendants each fall within the definition of a "seller" under Section 12 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77*l*, and, given that the System securities were sold to investors without a registration statement being in effect, violated Sections 5 and 12(1) of the 1933 Act, 15 U.S.C. §§ 77e, 77*l* (1). Count III contends that the FELC Defendants violated Section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2), through their participation in the offering and sale of investment securities by means of offering materials and related documents containing material misstatements and omissions.

Count IV charges the FELC Defendants with actual and constructive fraud by reason of their participation in a common scheme to defraud investors to whom each defendant owed the duty to advise them of the affirmative misstatements and omitted material facts. Furthermore, plaintiffs allege that each of the FELC Defendants either knew that his or its affirmative misrepresentations were untrue or made such statements recklessly and without any knowledge of their truth or falsity, and either knew at the time of his or its omission to state material facts that such facts were required to be stated in order to avoid misleading investors or recklessly omitted to state these material facts. Also, the FELC Defendants intended that investors act on the basis of the misrepresentations and omissions, and the investors, either directly or through their financial advisors, in fact reasonably relied on these misrepresentations and omissions to their detriment.

Count V alleges that the FELC experts breached a duty of reasonable care to in-

---

**10.** ¶ 95 of the Consolidated Complaint actually names "Enersonics" as an OEC Supplier. Although an "Enersonics Inc." was designated as a defendant when the *Waites* action was originally commenced in Illinois, no such company is named in the Consolidated Complaint. The Court assumes that plaintiffs intended to refer to defendant Energy Minder.

**11.** The Service Company Defendants are Control, Weatherman, Allstate, Miken, Enerpak, Dodge Electric, ESS, Precision, Niles, Minute-

man, Delaware, and Temperature Technologies, and their defendant principals and employees. Consolidated Complaint ¶¶ 45–56, 97. Actually, ¶ 97 of the Consolidated Complaint denominates Energy Minder a Service Company Defendant and fails to include Delaware within this category. This is apparently an oversight, as ¶¶ 42 and 55 allege that Energy Minder acted as supplier, rather than a service company, and that Delaware was a party to certain of the service agreements.

vestors in the rendering of their technical and financial analyses and legal opinions and thus should be held liable for common-law negligence. Count VI alleges that the FELC defendants are liable for treble damages under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68.

Counts VII—XII set forth analogous claims against the OEC Defendants.

### B. *Duco Complaint*

The *Duco* Complaint also contains twelve counts, but is structured differently from the Consolidated Complaint. OEC, Medina, Control, Robert Cleary, Weatherman, and Tobin are denominated "Promoter Defendants," Arteca and Lemonides, "Appraiser Defendants," Zayle Bernstein, the Bernstein firm and Kars, "Attorney Defendants," and Eckard Engineering, a "Miscellaneous Defendant." Count I alleges false and misleading material misrepresentations and omissions upon which defendants intended plaintiffs to rely and plaintiffs did in fact so rely. Count II alleges professional negligence by the Attorney Defendants, while Count III states a claim against Zayle Bernstein individually for his actions as a partner in the Bernstein firm and a principal of Eckard Engineering. Count IV asserts that the Appraiser Defendants failed to exercise due care in the preparation of their opinion letters. Count V sets forth a claim against all the defendants for breach of fiduciary duty.

Count VI alleges a violation of § 12(2) of the 1933 Act by all defendants, and Count VII asserts that all defendants acted in violation of § 10(b) of the 1934 Act. Count VIII contains allegations of breach of contract by Control and Weatherman, while Count IX contends that these defendants acted fraudulently and deceitfully by refusing to return monies paid to them by plaintiffs. Count X is premised upon an alleged violation by all defendants of the Georgia Securities Act of 1973, Ga. Code Ann. § 10–5–1 *et seq.* Count XI sets forth a breach of contract claim against OEC, and Count XII seeks the recovery of attorneys fees because of defendants' alleged bad faith. Unlike the Consolidated Complaint, the *Duco* Complaint does not include any claims under § 12(1) of the 1933 Act or RICO.

### C. *Horn Complaint*

The *Horn* Complaint sets forth seventeen separate counts against various defendants. Unlike the Consolidated Complaint and *Duco* Complaint, however, it does not specifically establish different categories of defendants. Count I claims that defendants violated § 12(2) of the 1933 Act. Count II asserts additional "controlling persons" liability under § 15 of the 1933 Act, 15 U.S.C. § 77o, since defendants purportedly controlled the unlawful conduct alleged in Count I. Count III sets forth a claim under § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), contending that defendants' conduct constituted a deceptive device, scheme, and artifice to defraud, and acts and practices that operated as a fraud or deceit upon plaintiffs. Count IV asserts § 15 liability, based upon the conduct alleged in Count III. Count V alleges the existence of a claim under § 10(b) of the 1934 Act.

Count VI contends that defendants have engaged in securities fraud under the Ohio "blue sky" law, Ohio Rev. Code Ann. Ch. 1707. Count VII alleges negligence by all the defendants, while Counts VIII and IX specifically allege malpractice by the attorney defendants and negligence by the engineer defendants, respectively. Count X asserts that defendants committed common-law fraud. Count XI alleges the existence of a violation of the Ohio Business Opportunity Purchaser's Protection Act, Ohio Rev. Code Ann. Ch. 1334. Count XII is a RICO count. Count XIII states that FNEC and Energy Minder each breached implied warranties that the Systems were merchantable and fit for the purpose for which they were intended. Count XIV alleges breach of the lease agreements, and Count XV asserts that defendants breached express statements, promises, and warranties that plaintiffs' investments would provide plaintiffs with certain tax benefits. Count XVI charges defendant Touche with ac-

countants' malpractice. Count XVII seeks punitive damages for defendants' purportedly reckless, outrageous, and malicious conduct. Like the *Duco* Complaint, but unlike the Consolidated Complaint, the *Horn* Complaint does not contain a claim of a § 12(1) violation.

## III. MOTIONS TO DISMISS

A number of the defendants have moved to dismiss plaintiffs' complaints. In conformance with the directions of the Court, these defendants have filed a joint memorandum in support of their motions containing arguments common to the moving defendants ("Joint Memorandum"). Additionally, several defendants have filed supplemental individual memoranda setting forth grounds for dismissal particularly applicable to plaintiffs' specific claims against them. The Court will first address the arguments contained in the Joint Memorandum, then turn to any points made by individual defendants that have not already been adequately covered by the Court's discussion of defendants' joint contentions.[12]

### A. *General Applicability of the Federal Securities Laws*

#### 1. *Definition of an "investment contract"*

Plaintiffs assert claims under the Securities Act of 1933, 15 U.S.C. §§ 77a–77bbbb, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk. Defendants contend, however, that the agreements allegedly entered into between the investors and defendants do not fall within the definition of "securities" covered by the federal securities laws.

The definitions of the term "security" are virtually identical under the 1933 and 1934 Acts, *compare* 15 U.S.C. § 77b(1)

with 15 U.S.C. § 78c(a)(10), and have been interpreted in a consistant manner by the courts, *e.g., United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621, 629 n. 12 (1975); *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564, 572 (1967). *See* S.Rep. No. 792, 73d Cong.2d Sess. 14 (1934). Plaintiffs, who have the burden of pleading facts sufficient to show that a security is at issue, *LaSalle National Bank v. Arthur Andersen & Co.*, 531 F.Supp. 702, 706 (N.D.Ill.1982), have alleged that the lease and sale agreements together constitute an "investment contract", which is one of the descriptive phrases included within both the 1933 and 1934 Acts' statutory definitions of security.

The United States Supreme Court set forth the approach to be taken in determining the existence of an investment contract in the landmark case of *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *Howey* was a suit by the Securities and Exchange Commission ("SEC") to enjoin the respondents from the offer and sale of units of a citrus grove development coupled with a contract for cultivating, marketing, and remitting the net proceeds to the investor. The respondents were two corporations under direct common control and management. One corporation owned tracts of citrus acreage that it offered to the public, while the other was a service company engaged in cultivating and developing many of these groves and harvesting and marketing the crops. The corporations offered each prospective customer both a land sales and a service contract after informing the customer that it was not feasible to invest in a grove unless service arrangements were made. Upon full pay-

---

**12.** The following defendants have joined in the Joint Memorandum: Giuffrida, FNEC, Tobin, Weatherman, Spierer, Woodward, the Bernstein firm, Zayle Bernstein, Grossman & Flask, Touche, Becker, SPC, Daverman, Greiner, Barrett, Chen, Kozich, Day & Zimmerman, Viron, Fluor, Kars, and Larry Kars, P.C. Most of these defendants have also filed individual supplementary memoranda. Additionally, defendants

FNEC and Giuffrida, Grossman & Flask and Robert Grossman, and Kars and Larry Kars, P.C. have submitted papers containing arguments concerned specifically with the *Duco* and *Horn* actions. Other defendants named in these two actions have chosen in their papers to focus on plaintiffs' complaints as a whole, rather than putting forth particular arguments addressed directly solely to given individual actions.

ment of the purchase price, the land was conveyed to the purchaser by warranty deed. While purchasers were free to make arrangements with other service companies, the superiority of the respondent service company was stressed, and 85% of the acreage sold to investors was in fact covered by service contracts with the respondent corporation. The purchasers were predominantly business and professional people who lacked the knowledge, skill, and equipment necessary for the care and cultivation of citrus trees, and were attracted to the offer by the expectation of substantial profits. 328 U.S. at 294–96, 66 S.Ct. at 1101–02.

The applicability of the federal securities laws to the transactions at issue in *Howey* depended on whether, under the circumstances, the land sales contract, warranty, deed, and service contract together constituted an investment contract. The Court observed that the term "investment contract" is not defined either by statute or by relevant legislative reports, but was common to many state "blue sky" laws in existence prior to the passage of the 1933 Act. State courts had broadly construed the term so as to afford the investing public a full measure of protection, and emphasized economic reality and substance over form. 328 U.S. at 297–98, 66 S.Ct. 1102–03. The Court then held that, for purpose of the federal securities laws, an investment contract:

> means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

328 U.S. at 298–99, 66 S.Ct. at 1103. Such a definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.*

Applying this definition to the facts presented by *Howey*, the Court held that the transactions clearly involved investment contracts. The Court noted that all the elements of a profit seeking business venture were present. The investors provided the capital and shared in the earnings and profits; the promoters managed, controlled, and operated the enterprise. The customers had no desire to occupy the land or develop it themselves; rather, they were attracted solely by the prospect of a return on an investment. The Court specifically stated that its conclusion was unaffected by the fact that some purchasers chose not to accept the full offer of an investment contract by declining to enter into an arrangement with the respondent service company. 328 U.S. at 300–01, 66 S.Ct. at 1103–04. Finally, the Court rejected the idea that a transaction can only constitute an investment contract where the enterprise is speculative or promotional in character and where the tangible interest that is sold has no intrinsic value independent of the success of the enterprise as a whole:

> The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value. See *S.E.C. v. C.M. Joiner Leasing Corp.,* [320 U.S. 344, 64 S.Ct. 124, 88 L.Ed. 88 (1943)]. The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae.

328 U.S. at 301, 66 S.Ct. at 1104.

The Supreme Court again considered the elements of an investment contract in *Forman,* 421 U.S. 837, 95 S.Ct. 2051. As in *Howey,* the Court stressed that the focus in determining the existence of a "security" must be placed upon the economic realities underlying a transaction, not upon the technical name appended to it, 421 U.S. at 848–49, 95 S.Ct. at 2058–59, and observed that the *Howey* test for the presence of an

investment contract embodied in shorthand form the essential attributes running through all of the Court's decisions defining securities. 421 U.S. at 851, 95 S.Ct. at 2060. The Court stated that the "touchstone" of an investment contract is "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entreprenaurial or managerial efforts of others." *Id.*[13] The Court went on to hold that tenants' shares in a corporation organized to own and operate the land and buildings that comprise Co-op City, a massive cooperative housing project in New York City constructed under the New York Private Housing Finance Law (commonly known as the "Mitchell-Lama Act"), did not constitute investment contracts, as purchasers of the stock were attracted solely by the prospect of acquiring a place to live, not by potential financial returns on their investments. 421 U.S. at 853-58, 95 S.Ct. at 2061-63.

■ The Supreme Court has therefore established three requisite elements for a contract, transaction, or scheme to be considered an investment contract under the federal securities laws: An investment contract exists when an individual (1) makes an investment (2) in a common enterprise or venture and (3) is reasonably led to expect profits to be derived from the efforts of the promoter or some third party. Defendants argue that plaintiffs have failed to meet either the second or third of these requirements.

### 2. *Commonality*

Defendants contend that the lease and service agreement arrangements entered into between individual investors and various defendants are not linked by a common enterprise or venture sufficient to bring these transactions within the definition of investment contracts. Defendants assert, in other words, that the necessary "commonality" is lacking.

The courts have divided upon two basic approaches to determining whether an investment satisfies the common enterprise or venture prong of the *Howey/Forman* test. Some courts have adopted what has become known as a "vertical commonality" approach, while others have required the presence of "horizontal commonality." Additionally, the vertical commonality approach has itself been subdivided into broader and more restrictive interpreta-

---

**13.** It might be observed that *Forman*'s formulation drops the word "solely" from the test of what constitutes an investment contract, *i.e.*, unlike *Howey*, *Forman* no longer speaks of the necessity that profits be derived *solely* from the efforts of others. The *Forman* Court was quite aware of this difference in its phrasing, but seemingly downplayed its significance. The Court took note of a Ninth Circuit decision holding that the word "solely" should not act as a strict or literal limitation on the definition of an investment contract but should be read realistically so as to include schemes that involve securities in substance if not in form, *Securities and Exchange Commission v. Glenn W. Turner Enterprises*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), but explicitly declined to express any view on the Ninth Circuit's interpretation of the *Howey* definition. 421 U.S. at 852 n. 16, 95 S.Ct. at 2060 n. 16.

The Second Circuit addressed this question of the nature of the term "solely" in *Securities and Exchange Commission v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982), and concluded that, although *Forman* had reserved the question of whether "solely" should be read literally, if faced with the question, the Supreme Court would not insist on literal application of the term, as such a strict reading would fly in the face of the Court's repeated directions to consider investment contracts in light of their economic realities and allow easy circumvention of the securities laws. 687 F.2d at 582. *See also 1050 Tenants Corp. v. Jakobson*, 503 F.2d 1375, 1378 n. 5 (2d Cir.1974); *Securities and Exchange Commission v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974); *Securities and Exchange Commission v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, 1239 (E.D.N.Y. 1976), *affirmed*, 556 F.2d 559 (2d Cir.1977), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).

In any event, defendants in the instant case have accepted the validity of a more liberal reading of the *Howey* requirement and do not set forth failure of the transactions at issue to conform with a literal reading of *Howey*'s use of the word "solely" as a basis for their motions to dismiss plaintiffs' claims under the federal securities laws. *See* Joint Memorandum at 12 n. 8.

tions that have each been employed in different cases.

Vertical commonality analysis focuses upon the nature of the relationship between the investor and the promoter. The broader interpretation of the vertical commonality approach holds that the requirement of a common enterprise or venture is met where the fortunes of all the investors are inextricably tied to the efficacy of the promoter's efforts. There must be, in other words, a direct nexus between the efforts of the promoter and the return on investors' investments. *E.g., Securities and Exchange Commission v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir.1974); *Securities and Exchange Commission v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974). *See Michigian v. Art Capital Corp.*, 612 F.Supp. 1421 (S.D.N.Y.1985). The more restrictive interpretation of vertical commonality requires not only an interweaving between the *efforts* of the promoter and the fortune of investors, but also a direct relationship between the *success* of the promoter and that of the investors, *i.e.*, the fortunes of the promoters and investors must rise and fall together. *E.g., Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc.*, 686 F.2d 818 (9th Cir.1982), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 495 (1983); *Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir.1982), *cert. denied,* —— U.S. ——, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985); *Brodt v. Bache & Co.*, 595 F.2d 459 (9th Cir.1978). *See Michigian*, 612 F.Supp. 1421.

The horizontal commonality approach, by contrast, looks to the relationship between the interests of the various investors. Under this perspective, the necessary commonality is deemed present only where plaintiffs make a showing of the pooling of investors' interests. Put slightly differently, the horizontal commonality approach requires that the fortunes of each investor in a pool of investors be tied to the success of the overall venture. In fact, a finding of horizontal commonality requires a sharing or pooling of funds. *E.g., Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459 (3d Cir.1982); *United Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174 (6th Cir.1981), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir.1980), *affirmed on other grounds,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96 (7th Cir.1977); *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). *See Michigian*, 612 F.Supp. 1421.

The Second Circuit has not decided which approach should be employed by courts within this Circuit, and the District Court cases confronting the issue vary in the test of commonality used. *Compare, e.g., Troyer v. Karcagi*, 476 F.Supp. 1142 (S.D.N.Y.1979) (broad vertical commonality), *Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225 (S.D.N.Y.1981) (restrictive vertical commonality), *and Darrell v. Goodson* [1979–80] Fed.Sec.L.Rep. (CCH) ¶ 97,349 (S.D.N.Y.1980) (horizontal commonality). Defendants argue, however, that whichever approach is deemed most appropriate to the case at bar, plaintiffs have not sufficiently alleged the existence of a common enterprise or venture.

### 3. *Commonality in the instant case*

In considering whether plaintiffs in the instant case have sufficiently alleged the presence of a common enterprise or venture, the Court first notes that the scheme plaintiffs allege is parallel in a number of respects to the scheme before the Supreme Court in *Howey*. The *Howey* respondents offered a land sale, warranty deed, and service contract to customers who were interested in the offering not because of any particular familiarity or expertise with citrus groves, but simply as business people seeking a return on an investment. The respondents managed, controlled, and operated the enterprise. Although investors were technically free not to enter into a service contract with a

company affiliated with the promoter, they were urged to make such an agreement and 85% in fact did so. Similarly, the case at bar involves the offering of lease and service agreements regarding energy conservation devices to passive investors who were wholly inexperienced in the field of selecting, installing, and servicing such devices and entered into such agreements for the sole purpose of maximizing their income through use of the tax laws and by returns on their investments. As in *Howey*, various defendants, rather than the investors themselves, ran the entire operation. Investors were not required to contract with one of the defendant service companies, which were closely affiliated with the promoters of the scheme, but realistically had few other options given their inexperience in the field.

It appears, therefore, that given the similarities between the instant case and the facts presented by *Howey*, a finding of the existence of an investment contract is clearly warranted. Defendants' argument that investors in the Systems were technically free not to contract with the service companies only further points up the parallels to *Howey*, in which the Supreme Court held explicitly that the arrangements at issue in that case constituted investment contracts even though customers were not compelled to enter in service agreements and certain customers in fact declined to do so. Furthermore, the fact that *Howey* involved sales while the instant case involves leases is irrelevant, as the Supreme Court has explicitly held that leasehold interests may constitute securities. *Securities and Exchange Commission v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

■ Furthermore, whichever test of commonality is applied to the case at bar, the Court finds that plaintiffs have alleged facts adequate to meet this requisite element of an investment contract. There can be no real question that the scheme alleged meets both the broader and more restrictive vertical approaches to the issue of commonality. The investors' fortunes were inextricably and directly tied to both the efforts and fortunes of the promoters. The promoters' profits and any return on their investments that investors might achieve were both ultimately dependent upon and would vary with the successful location and profitability of appropriate end-users for the Systems. While the promoters might still receive rental payments from investor-lessees even if the Systems were not successfully marketed to end-users, the promoters and investors both required such rentals to end-users in order to realize any profits from the revenue sharing arrangements between the promoters, service companies, and investors as to the income stream generated by the energy savings of the end-users.

Whether the alleged scheme satisfies the requirements of the horizontal commonality approach is a closer issue, but the Court concludes that the complaints do indeed set forth claims sufficient to meet the requirements of horizontal as well as vertical commonality. As plaintiffs allege in the Consolidated Complaint and point out in their brief in opposition to defendants' Joint Memorandum, Consolidated Complaint ¶¶ 134–35, Memorandum of Plaintiffs in Opposition to Joint Motion to Dismiss the Consolidated Class Action Complaint ("Plaintiffs' Memorandum") at 13, to the extent that the scheme was capable of working in the manner described to investors by defendants, it was dependent upon the pooling of the investments, *i.e.*, investors supplied the capital necessary for the supplying and marketing of the Systems by pre-paying fees under the lease and service agreements prior to the actual manufacture or delivery of the Systems, thereby financing the promoters' operations through their pooled funds. As discussed above, the success of each investor was dependent upon the efforts and success of the promoters and the service companies in selecting and purchasing, or sub-leasing, installing, servicing, and managing the energy conservation devices. The success of this entire scheme, in turn, was dependent on the receiving of pre-paid funds from

investors that could be pooled so as to finance the very operation of the scheme.

Additionally, the joint interest of the investors in obtaining income tax benefits from the lease of the Systems is further evidence of the horizontal commonality of the enterprise organized by defendants. This interest in achieving tax benefits through investment in a leasing scheme is highly analogous to a scheme recently considered by a court within the Sixth Circuit, one of the Circuits which has adopted the horizontal commonality approach as the most appropriate application of the *Howey/Forman* test.[14] *Kolibash v. Sagittarius Recording Co.*, 626 F.Supp. 1173 (S.D. Ohio 1986), involved a tax shelter scheme in which defendant Sagittarius Recording Company ("Sagittarius") leased master recordings to investors for a period of seven and one half years. Pursuant to the lease agreement, each investor would make both an initial cash payment and an additional payment, and obligated himself to make efforts entailing an expenditure of a given minimum sum to promote the leased recording. Sagittarius provided each investor with the names of potential distributors for the recordings but did not otherwise assist in promotion or distribution of the recordings. It was undisputed that most if not all of the investors lacked the experience typically necessary successfully to market such recordings. In consideration for the lease payments, Sagittarius transferred to investors the investment tax credit associated with the purchase of each master recording. Investors would also receive a certain percentage of the net proceeds that they earned as a result of promotion and distribution of the recordings, but were required to pay Sagittarius a share of these proceeds as well.

Noting the Supreme Court's command that substance be elevated over form and that economic realities must be emphasized in determining if the federal securities laws

cover a given situation, *Forman*, 421 U.S. at 851–52, 95 S.Ct. at 2060; *Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553, the court held that, although horizontal commonality was lacking with respect to the earnings the investors expected to receive from the promotion and distribution of the master recordings, the tax aspects of the situation were a different matter. The court observed that Sagittarius' primary assets were its recordings, which the company had purchased primarily through full recourse promissory notes. The notes were subject to devaluation, a situation that could be avoided only through the influx of the investors' payments to the company, thereby increasing Sagittarius' net worth. As devaluation of the notes would destroy the value of the investment tax credit, and thus the scheme itself, the financial fate of each investor was tied to Sagittarius' obtaining and pooling the necessary capital from the other investors.

The circumstances presented by *Kolibash* are strikingly similar to those in the case at bar. Both cases involve leasing arrangements marketed to investors inexperienced in the relevant product market but interested in the generation of income from their investment and the acquisition of a tax benefit. As in *Kolibash*, the investors in the scheme at issue before this Court could obtain the desired tax benefit only if the promoters could maintain their financial health, a situation that was possible only if these companies actually secured payments and a pool of funds from investors. While in *Kolibash* promoter success was necessary to maintain the value of the tax credit, in the instant case such success was required to allow the purchase, supply, and marketing of the very equipment upon which the tax benefit was premised. In fact, the case at bar presents an even stronger example of horizontal commonality than does *Kolibash*, because, as discussed above, there is the re-

---

**14.** It should also be noted at this juncture that defendants Fluor and Viron argue that the substantive law of the Sixth Circuit necessarily controls plaintiffs' claims against them while defendants SPC, Daverman, Greiner, Barrett and

Chen assert that the law of either the Sixth or Seventh Circuit governs the suit insofar as they may be subject to liability. Both these Circuits have opted for the horizontal commonality approach. *See supra* § III(A)(2).

quired commonality not only with respect to the tax benefits, but with regard to potential income as well, since without the funds from the pool of investors, the promoters would not have the finances to purchase and market the Systems from which the revenue would be generated.

For the reasons set forth above, the Court holds that plaintiffs have alleged facts sufficient to support findings of both vertical and horizontal commonality on these motions to dismiss.

### 4. Derivation of profits from effects of promoters or others

■ Defendants also argue that plaintiffs have failed to satisfy the third required element of an investment contract, *i.e.*, that investors are reasonably led to expect profits to be derived from the efforts of the promoter or some third party. Defendants contend that the investors' freedom to select a service company outside of those suggested to investors by FELC or OEC, or to locate end-users and install and service the Systems themselves, indicates that investors had control of their investments sufficient to take them out of the realm of investment contracts covered by the 1933 and 1934 Acts.

Defendant's assertions are directly at odds with *Howey* itself. As this Court has noted at several points throughout this opinion, *see supra*, § III(A)(1), (3), the *Howey* Court, in laying down the guidelines to be followed in determining the presence of an investment contract, explicitly rejected the claim that an option to decline to enter into service agreements with defend-

ant corporations necessarily places a transaction outside the reach of the federal securities laws. What is essential is the consideration of the economic realities confronting prospective investors in a given scheme. *Forman*, 421 U.S. at 848–49, 95 S.Ct. at 2058–59. As the Second Circuit remarked in *Securities and Exchange Commission v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 4 L.Ed.2d 931 (1982), with regard to a supposedly optional arrangement, "It has long been understood that the mere existence of such an option is not inconsistent with the entire scheme's being an investment contract." 687 F.2d at 582. Focus must be placed not upon whether investors have a theoretical right to reject an option or whether it is somehow possible for an investor to profit without entering into the supposedly optional arrangement, but upon whether the typical investor would be expected under the circumstances to take the option, thus remaining passive and deriving profit from the efforts of others. *Id.* at 582–83. It is clear from considering the economic realities and circumstances presented by the situation allegedly in the complaints, given the investors' lack of expertise in the field of energy savings devices, the people who chose to lease the Systems from FELC and OEC had little choice but to contract with one of the suggested service companies. Accordingly, the Court holds that plaintiffs have met the third prong of the *Howey/Forman* test for investment contracts.[15]

For the above-stated reasons, the Court holds that the lease and service agreements constitute "investment contracts" governed

---

15. Defendants argue that the instant case is analogous to *Securities and Exchange Commission v. Energy Group of America, Inc.*, 459 F.Supp. 1234 (S.D.N.Y.1978), in which Judge Stewart held that contracts to utilize the services of a private firm in connection with the placement of bids on government oil and gas lotteries conducted by the United States Department of Interior did not constitute investment contracts. With all due respect to defendants, the Court does not see nor accept the purported analogy. Also, defendants rely on the Fifth Circuit's decision in *Williamson v. Tucker*, 645 F.2d 404 (5th

Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), for the proposition that:

"[T]he actual control exercised by the purchaser is irrelevant. So long as the investor has the right to control the asset he has purchased, he is not dependent on the promoter or on a third party for those essential managerial efforts which affect the failure or success of the enterprise."

*Id.* at 421. In *Aqua-Sonics*, however, the Second Circuit explicitly rejected *Williamson*'s authority as an accurate statement of the law. 687 F.2d at 584.

by the Securities Act of 1933 and Securities Exchange Act of 1934.

## B. RICO

Although designed primarily as a criminal statute, the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961—68, provides a private right of action to "any person injured in business or property by reason of a" violation of the statute. Successful plaintiffs are entitled to treble damages and costs, including attorneys fees. 18 U.S.C. § 1964(c). In recent years, litigants have taken greater notice of RICO's civil provision, and an increasing number of claims under § 1964 have made their way into the federal courts.[16] Counts VI and XII of the Consolidated Complaint set forth RICO claims against the FELC and OEC Defendants, respectively, while Count XII of the *Horn* Complaint asserts a RICO claim against the defendants named in that action. Defendants contend that plaintiffs' allegations are insufficient to state claims under the racketeering statute.

§ 1962 of the statute prohibits a number of activities. § 1962(a) states, "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt.... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." § 1962(b) bars any person from acquiring or maintaining through a pattern of racketeering activity or through collection of an unlawful debt any interest or control of any enterprise engaged in or affecting interstate or foreign commerce. § 1962(c) makes it unlawful for any person employed by or associated with such an enterprise to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. § 1962(d) declares unlawful any conspiracies to violate § 1962(a), (b), or (c). § 1961, the statute's definitional provision, *inter alia,* declares "racketeering activity" to include fraud in the sale of securities, § 1961(1)(D); "person" to include "any individual or entity capable of holding a legal or beneficial interest in property," § 1961(3); "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," § 1961(4); and "pattern of racketeering" to require at least two acts of racketeering activity within a ten year period, § 1961(5).

Plaintiffs allege violations of each of the subsections of § 1962. Plaintiffs assert that each defendant is a person within the meaning of § 1961(3), that the scheme for selling the investment contract securities constitutes an enterprise within the meaning of § 1961(4), and that this enterprise is distinct from the pattern of racketeering activity in which defendants engaged. Plaintiffs contend that each of the individual sales of the securities to investors constituted an offense involving fraud in the sale of securities and together constituted racketeering activity within the meaning of § 1961(1).

### 1. *Person/Enterprise Distinction*

Defendants argue that plaintiffs' RICO claims cannot withstand defendants' motion to dismiss because plaintiffs have failed to allege the necessary distinction between the "persons" and the "enterprise" involved. All but one of the Circuits are in basic agreement that, in order to state a valid claim under RICO, a distinction must be drawn between the entity alleged to constitute a person under

**16.** RICO was enacted in 1970. Of the civil RICO cases decided by district courts since the passage of the statute through 1984, only 3% were decided during the 1970's, 2% were decided in 1980, 7% in 1981, 13% in 1982, 33% in 1983, and 43% in 1984. Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 55 (1985), *cited in Sedima S.P.R.L. v. Imrex Company, Inc.,* —— U.S. ——, 105 S.Ct. 3275, 3277 n. 1, 87 L.Ed.2d 346, 349 n. 1 (1985). Civil RICO claims have by now become a common ingredient in securities law litigation.

§ 1961(3) and the entity designated the enterprise under § 1961(4). As the Second Circuit held in *Bennett v. United States Trust Co. of New York*, 770 F.2d 308 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), for example, an entity cannot simultaneously be cast as both the "person" and the "enterprise." A complaint must distinguish between the enterprise and the person controlling the affairs of the enterprise. *Id.* at 315. The Fourth Circuit has stated, " '[E]nterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit, and, failing that, to punish." *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). *See also, e.g., B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3d Cir.1984); *Haroco, Inc. v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384 (7th Cir.1984), *affirmed on other grounds*, —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Rae v. Union Bank*, 725 F.2d 478 (9th Cir.1984); *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *affirmed upon reconsideration en banc*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Of the Circuits that have considered the issue, only the Eleventh Circuit has failed to require this differentiation. *United States v. Hartley*, 678 F.2d 961 (11th Cir. 1982), *cert. denied*, 459 U.S. 1170, 1183, 103 S.Ct. 815, 834, 74 L.Ed.2d 1014 (1983).

 However, while defendants may be correct in their statement of the law, the Court cannot agree with their contention that plaintiffs' allegations have failed to conform to this requirement of a person/enterprise distinction. Plaintiffs allege that each of the individual defendants is a person under RICO, while asserting that the required enterprise consists of the scheme for selling the securities. As plaintiffs and defendants both note, the denomination of the scheme as the enterprise can and should be interpreted as a reference to the defendants as a group. Plaintiffs' Memorandum at 39; Defendants' Joint

Memorandum at 32. Under RICO, an enterprise need not necessarily be a legal entity such as a partnership or corporation, but may consist of "any union or group of individuals associated in fact." § 1961(4). *See also Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Such associations-in-fact may consist not only of individuals, but of groups of otherwise legally separate corporations. *United States v. Huber*, 603 F.2d 387 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Fustok v. Conticommodity Services, Inc.*, 618 F.Supp. 1074 (S.D.N.Y.1985). Moreover, an enterprise composed of an association-in-fact, even if made up entirely of individual defendants deemed to be § 1961(3) "persons," is to be viewed for purposes of RICO claims as possessing a separate existence from its individual members. As the Seventh Circuit stated in *Haroco*:

> Where persons associate "in fact"....., each person may held liable under RICO for his, her or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity. But the nebulous association in fact does not itself fall within the RICO definition of "person." We doubt that an "association in fact" can, as such, hold any interest in property or even be brought into court. In the association in fact situation, each participant in the enterprise may be a "person" liable under RICO, but the association itself cannot be.

747 F.2d at 401. Thus, to quote Judge Lasker in *Fustok*, "[A]n association in fact which constitutes a RICO enterprise is not merely a synonym for the collective of 'individuals' which form the association, but instead, it is a distinct entity." 618 F.Supp. at 1076. *See also First Federal Savings and Loan Association of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F.Supp. 427 (S.D.N.Y.1986).

 In the case at bar, the various defendants constitute persons under RICO, while the interaction and relationship between these defendants with regard to the

alleged scheme to sell securities comprises an association-in-fact enterprise separate and distinct from these individual persons. Accordingly, the Court holds that the Complaint adequately distinguishes between the "person" and "enterprise" elements of plaintiffs' civil RICO claims.[17]

### 2. *Existence of a "Pattern"*

■ Defendants also contend that plaintiffs have failed sufficiently to allege the existence of a "pattern of racketeering activity" within the meaning of § 1961(5). According to defendants, plaintiffs have asserted merely that defendants engaged in a single scheme that does not constitute the "pattern" required under RICO.

In *Sedima, S.P.R.L. v. Imrex Co., Inc.,* — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court, per Justice White, discussed the "pattern" requirement in a lengthy footnote. Justice White observed that § 1961(5)'s definition of "pattern of racketeering activity" requires at least two predicate acts of racketeering, but does not mean that the commission of two such acts automatically establishes the existence of a "pattern" in a given case. "The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.'" — U.S. at —, n. 14, 105 S.Ct. at 3285 n. 14.

Defendants argue that under *Sedima* and certain subsequent cases interpreting RICO's pattern requirement in light of *Sedima, e.g., Superior Oil Co. v. Fulmer,* 785 F.2d 252 (8th Cir.1986); *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.,* 616 F.Supp. 1418 (W.D.Okla. 1985); *Rojas v. First Bank National Asso-*

*ciation,* 613 F.Supp. 968 (E.D.N.Y.1985), plaintiffs' allegations do not meet the pattern requirement. Plaintiffs' allegations, however, constitute far more than the few "isolated acts" with which the *Sedima* Court was concerned. *See Sedima,* — U.S. —, — n. 14, 105 S.Ct. at 3285 n. 14; *see also, e.g., Northern Trust,* 615 F.Supp. 828 (two specified acts not a "pattern"); *Rojas,* 613 F.Supp. at 971 n. 1 ("Several isolated acts ... do not a pattern make"). Nor do plaintiffs merely allege the existence of a single fraudulent scheme or transaction that defrauded a single individual plaintiff. *See Superior Oil,* 785 F.2d 252; *Professional Assets,* 616 F.Supp. 1418. Rather, plaintiffs have alleged a pattern of a racketeering activity consisting of thousands of fraudulent transactions over the course of time involving a large class of investors and entailing numerous mailings of and use of telephone communications regarding offering materials and related documents, investment contracts, technical and financial analyses, and legal opinions, and the establishment of a marketing and service network for the investment contracts and Systems. *Cf. Alexander Grant & Co. v. Tiffany Industries, Inc.,* 770 F.2d 717 (8th Cir.1985) (thirty predicate acts with allegations demonstrating similar purposes, results, participants, victims, and methods of commission constitute pattern); *First Federal Savings and Loan Association of Pittsburgh,* 629 F.Supp. 427 (pattern exists even when separate mailings to different plaintiffs arise out of single scheme to defraud); *Graham v. Slaughter,* 624 F.Supp. 222 (N.D.Ill.1985) (twenty related but separate predicate acts constitute pattern; pattern of racketeering does not require pattern of fraudulent schemes); *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985)

---

**17.** Plaintiffs argue that the requirement of demonstrating the existence of an enterprise separate from the denominated persons applies only to claims arising under § 1962(c), not to those brought under the other § 1962 subsections, and cite *B.F. Hirsch,* 751 F.2d 628, in support of this proposition. While the Court maintains some reservations about the validity of such a narrow interpretation of the requirement, *see*

*Computer Sciences,* 689 F.2d at 1190–91; *Kredietbank v. Joyce Morris, Inc.,* No. 84–1903, slip. op. (D.N.J. January 9, 1986), given the Court's holding that plaintiffs have adequately alleged a person/enterprise distinction, the effect of failure sufficiently to plead such a distinction on counts premised upon each of the different § 1962 subsections need not be further addressed nor resolved.

(two related acts arising out of same scheme constitute pattern).[18]

For the reasons set forth above, defendants' motions to dismiss plaintiffs' RICO claims are denied.

### C. § 12 Liability as Sellers or Participants

§ 12 of the 1933 Act reads:

*Civil liabilities arising in connection with prospectuses and communications*

Any person who—

(1) offers or sells a security in violation of 77e of this title, or

(2) offers or sells a security....by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him....

15 U.S.C. § 77l.

Liability under § 12 in both the Second and Sixth Circuits [19] is not limited solely to persons technically in privity with a purchaser, but includes persons who, although not literally "sellers," substantially participated in the sale of securities. *Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1359, 2713, 84 L.Ed.2d 381 (1985); *Katz v. Amos Treat & Co.,* 411 F.2d 1046 (2d Cir.1969); *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270 (S.D.N.Y. 1984); *In re Caesars Palace Securities Litigation,* 360 F.Supp. 366 (S.D.N.Y.1973). Within the Second Circuit, participation sufficient to expose a party to liability under § 12 can include active involvement in the transaction, or aiding and abetting or conspiring with the seller. *Klein,* 591 F.Supp. 270. The Sixth Circuit requires that a participant's acts be both necessary to and a substantial factor in the sales transaction. *Davis,* 739 F.2d 1057.

Various of the defendants argue that plaintiffs' allegations against them are insufficient to establish their liability under § 12. The Court need not address individually each of the defendants' specific contentions as to their particular liability. It suffices to say that the Court has carefully considered each of the defendants' arguments in light of the allegations against them contained in the complaints, and finds that, in the context of these motions to dismiss, plaintiffs' allegations of participation in the purportedly improper sale of the investment contracts at issue are sufficient to state § 12 claims against the named defendants whether these claims are viewed under the perspective of the Second or Sixth Circuit.

### D. Actionable Representations and Duties of Disclosure

Various of the FELC and OEC "Expert Defendants" argue that plaintiffs fail to

---

**18.** At oral argument, defendants briefly raised the additional argument that plaintiffs' RICO claims fail to make a necessary distinction between the "enterprise" and "pattern of racketeering activity" requirements. Defendants' contention cannot withstand the Second Circuit's holdings in *United States v. Mazzei,* 700 F.2d 85 (2d Cir.1983), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), *United States v. Bagaric,* 706 F.2d 42 (2d Cir.), *cert. denied,* 464 U.S. 840, 917, 104 S.Ct. 133, 134, 283, 78 L.Ed.2d 128, 261 (1983), and *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

**19.** As noted earlier, *see supra* at note 14, defendants Fluor and Viron contend that Sixth Circuit law must govern any claims against them and SPC, Daverman, Greiner, Barrett, and Chen assert that Sixth and Seventh Circuit law controls any liability to which they may be subject. Fluor and Viron, but not the other noted defendants, have specifically raised failure to comply with the seller or participant requirements of § 12 as a ground for dismissal. Additionally, none of the parties has brought to the attention of the Court, nor is the Court otherwise aware of, any Seventh Circuit law on this point.

state either § 10(b)[20] or common-law fraud claims against them because these defendants did not act with scienter, made no actionable representations, and had no independent duty of disclosure. The case law is quite clear on the point that liability under § 10(b), which provides a remedy roughly equivalent to the common-law remedy for fraud, requires scienter. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also e.g., Davis,* 739 F.2d 1057; *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir.1973). The necessary scienter may consist either of actual knowledge or, generally, reckless conduct. *E.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566 (2d Cir.), *cert. denied,* 459 U.S. 838, 908, 103 S.Ct. 86, 213, 74 L.Ed.2d 80, 170 (1982); *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980); *Sunstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *In re Investors Funding Corp. of New York Securities Litigation,* 523 F.Supp. 550 (S.D.N.Y.1980).

■ Defendants attempt to buttress their arguments that they lacked scienter and did not otherwise violate any duty owed to plaintiffs essentially by disputing the ultimate validity of the allegations contained in plaintiffs' complaint. Again, it must be stressed that such lines of argument are inappropriate on a motion to dismiss, where the Court is constrained to look solely at the adequacy of the pleadings and must take all of the allegations of the complaint, along with all reasonable inferences, as true. *See supra* § I(A) and cases cited therein. Plaintiffs' thoroughly drafted and detailed complaints more than sufficiently allege that each of the defendants, either knowingly or in reckless disregard of the truth, made actionable misstatements and omissions, and either knew or recklessly disregarded the fact that their actions, analyses, and opinions would be used by the Promoter Defendants and reasonably relied upon by the investors.

Accordingly, the Court holds that the plaintiffs have stated claims under both § 10(b) of the 1934 Act and the common law of fraud.[21]

### E. *Punitive Damages Under the Federal Securities Law*

■ Defendants assert that plaintiffs' claims must be dismissed insofar as they

---

**20.** § 10 provides, in relevant part:
*§ 78j. Manipulative and deceptive devices.*
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j. Rule 10b–5, promulgated by the Securities and Exchange Commission under authority of the 1934 Act, reads:
*§ 240.10b–5 Employment of manipulative and deceptive devices.*
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statements of a material fact or to omit to state material fact necessary in order to make the statement made, in the light of the circumstances, under which they were made not misleading or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

**21.** Certain of the moving defendants contend in their supplementary memoranda that plaintiffs' allegations are not only insufficient to withstand a Fed.R.Civ.P. 12(b) motion to dismiss, but also violative of Fed.R.Civ.P. 9(b)'s requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs' allegations are more than adequate to survive not only defendants' challenge under Rule 12(b), but also their attack on the complaints on Rule 9(b) particularity grounds. *See Goldman,* 754 F.2d 1059; *Helfant v. Louisiana & Southern Life Insurance Co.,* 82 F.R.D. 53 (E.D.N.Y.1979).

seek recovery of punitive damages under the federal securities laws. There is no question that defendants are correct in this contention and, in fact, plaintiffs have chosen not to dispute this point in their responsive papers. As the Second Circuit observed in *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1284 (1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), "it would no doubt jolt and startle the draftsman of the 1933 Act to be told that they.... authorized the recovery of punitive damages." *See also Flaks v. Koegel*, 504 F.2d 702 (2d Cir.1974); *Aronson v. TPO, Inc.*, 410 F.Supp. 1375 (S.D.N.Y. 1976); *Klein v. Spear, Leeds & Kellogg*, 309 F.Supp. 341 (S.D.N.Y.1970). The 1934 Act directly states, "[N]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover.... a total amount in excess of his actual damages." 15 U.S.C. § 78bb(a). *See also Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303 (2d Cir.1977); *Globus*, 418 F.2d 1276; *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The Court therefore holds that plaintiffs' claims must be dismissed to the extent that they seek punitive damages under the 1933 and 1934 Acts.

### F. *Common-Law Negligence*

■ Counts V and XI of the Consolidated Complaint set forth common-law negligence claims against the FELC and OEC Defendants, respectively. The *Duco* and *Horn* complaints likewise contain negligence claims. Defendants argue that plaintiffs' allegations are insufficient to state such claims. Defendants' Joint Memorandum supports this contention by reference to New York state law and the Restatement of Torts 2d. A number of the individual defendants rely on similar authority in their supplemental memoranda, while others cite to the law of states such as Michigan and Florida. The lawsuits now before the Court pursuant to the Order of the Judicial Panel on Multidistrict Litigation were originally commenced in various forums around the country. In

determining which law to apply to the plaintiffs' negligence claims, therefore, the Court must look to the law of the various transferor forums. *E.g., Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In re Agent Orange Product Liability Litigation*, 580 F.Supp. 690 (E.D.N.Y.1984); *Windbourne v. Eastern Air Lines, Inc.*, 479 F.Supp. 1130 (E.D. N.Y.1979), *reversed on other grounds*, 632 F.2d 219 (2d Cir.1980).

■ As the parties have not fully briefed the complicated choice of law issues arising in these consolidated actions, the Court concludes that it would be inappropriate at this juncture to attempt to address the viability of the negligence claims of certain plaintiffs against certain defendants under the law of specific given states. Accordingly, defendants' motions to dismiss plaintiffs' common-law negligence claims on the grounds that they fail to state causes of action under particular states' laws are denied at this time.

### G. *Statute of Limitations*

§ 13 of the 1933 Act states:
*Limitations of actions*

No action shall be maintained to enforce any liability created under section [11 or 12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section [12(1)] of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section [11 or 12(1)] of this title more than three years after the security was bona fide offered to the public, or under section [12(2)] of this title more than three years after the sale.

15 U.S.C. § 77m.

Defendants Zayle A. Bernstein, the Bernstein firm, and Spierer, Woodward contend that § 13 bars plaintiffs' § 12(1) claims

against them. These defendants, relying upon the First Circuit's decision in *Cook v. Avien*, 573 F.2d 685 (1st Cir.1978), argue that § 13 requires the application of a strict one year limitation period, running from the date of sale, that cannot be tolled by the fact that an investor did not discover the alleged § 12 violation until after this one year period had already run.

 The better rule, and the rule within the Second Circuit, however, is that where the existence of a cause of action under the securities laws has been concealed from prospective plaintiffs as a result of fraudulent concealment by defendants, or where the cause of action itself sounds in fraud, the statute of limitations should be tolled. *Katz*, 411 F.2d 1046. *See also Houlihan v. Anderson-Stokes, Inc.*, 434 F.Supp. 1319 (D.D.C.1977); *Competitive Associates, Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121 (S.D.N.Y.1973). Plaintiffs allege that the various defendants participated in the joint preparation of misleading offering materials and related documents that contained untrue statements and omissions of material facts and misrepresented the value, earnings potential, quality, and nature of the investments. Plaintiffs have incorporated these allegations by reference into their counts asserting § 12 violations and explicitly asserted that the fraudulent and conspiratorial acts

spelled out throughout the complaints constituted the proximate cause of the sale of the securities to each investor. Although the complaints do not directly state when plaintiffs discovered defendants' allegedly wrongful scheme, they do assert that legal action was commenced within one year of the purported § 12 violation.

Accordingly, the Court holds that plaintiffs' complaints allege facts sufficient, at least for purposes of motions to dismiss, to indicate compliance with the limitation period applicable to § 12(1) claims. *Cf. Competitive Associates*, 58 F.R.D. 121 (motion to dismiss on statute of limitations grounds denied where there appears to be question of fact regarding time of reasonable discovery of § 12 violation).[22]

### H. Liability under the Georgia Securities Act of 1973 and Ohio "Blue Sky" Law

 Count X of the *Duco* Complaint alleges that defendants violated the provisions of the Georgia Securities Act of 1973, Ga.Code Ann. § 10–5–1 *et seq.* Count VI of the *Horn* Complaint alleges violation of the Ohio "blue sky" law, Ohio Rev.Code Ann. Ch. 1707. Defendants Kars and Larry Kars, P.C. argue that, as the definitions of a "security" under both these provisions are closely parallel to those contained in the federal securities laws,[23] if the Court were to determine that plaintiffs have

---

**22.** Defendant Fluor argues that plaintiffs' failure specifically to state the time and circumstances of their discovery of the alleged violations warrants dismissal of both their § 12(1) and 12(2) claims against Fluor on statute of limitation grounds. Plaintiffs' allegations, however, are set forth with adequate particularity to withstand Fluor's motion to dismiss.

**23.** The Georgia Securities Act of 1973 defines "security" as follows:

'Security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of indebtedness, investment certificate, certificate of interest or participation in any profit-sharing agreement, certificate of interest in oil, gas, or other mineral rights, collateral trust certificates, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, limited partnership interest, or beneficial interest in profits or earnings, or any other instrument commonly known as a se-

curity, including any certificate of interest or participation in, temporary or interim certificate for, receipt for, guaranty of, or warrant or right to subscribe to or purchase, any of the foregoing. The term 'investment contract' shall include but is not limited to an investment which holds out the possibility of return on risk capital even though the investor's efforts are necessary to receive such return if:
(A) Such return is dependent upon essential managerial or sales efforts of the insurer or its affiliates; and
(B) One of the inducements to invest is the promise of promotional or sales efforts of the issuer or its affiliates in the investor's behalf; and
(C) The investor shall thereby acquire the right to earn a commission or other compensation from sales of rights to sell goods, services, or other investment contracts of the issuer or its affiliates.

Ga.Code Ann. § 10–5–2(16).

failed to state a claim under the 1933 or 1934 Acts, the claims under the Georgia and Ohio statutes must be dismissed as well. The Court is inclined to agree with defendants' contention and analysis. The Court, however, has concluded that plaintiffs *have* sufficiently established the existence of securities under federal law and *have* stated claims under the 1933 and 1934 Acts. Accordingly, the Court holds that the *Duco* and *Horn* plaintiffs have adequately stated claims under the Georgia and Ohio laws, respectively, and denies defendants' motion to dismiss Count X of the *Duco* Complaint and Count VI of the *Horn* Complaint.

> Ohio Rev.Code Ann. § 1707.01(B) states:
> "Security" means any certificate or instrument which represents title to or interest in, or is secured by any lien or charge upon, the capital, assets, profits, property, or credit of any person or of any public or governmental body, subdivision, or agency. It includes shares of stock, certificates for shares of stock, voting-trust certificates, warrants and options to purchase securities, subscription rights, interim receipts, interim certificates, promissory notes, all forms of commercial paper, evidences of indebtedness, bonds, debentures, land trust certificates, fee certificates, leasehold certificates, syndicate certificates, endowment certificates, certificates or written instruments in or under profit-sharing or participation agreements or in or under oil, gas, or mining leases, or certificates or written instruments of any interest in or under the same, receipts evidencing preorganization or evidencing preorganization or reorganization subscriptions, preorganization certificates, reorganization certificates, certificates evidencing an interest in any trust or pretended trust, any investment contract, any instruments evidencing a promise or an agreement to pay money, warehouse receipts for intoxicating liquor, and the currency of any government other than those of the United States and Canada, but such sections shall not apply to bond investment companies or to the sale of real estate.

> **24.** Ohio Rev.Code Ann. § 1334.02 reads:
> In connection with the sale or lease of a business opportunity plan, no seller or broker shall fail to provide to a prospective purchaser, at least ten business days prior to the execution of an agreement selling or leasing a business opportunity plan, a written disclosure document.
>
> . . . . .
>
> Ohio Rev.Code Ann. § 1334.03 provides:

## I. *Liability under the Ohio Business Opportunity Purchaser's Protection Act*

Count XI of the *Horn* Complaint alleges that defendants violated §§ 1334.02 and 1334.03 of the Ohio Business Opportunity Purchaser's Protection Act ("Protection Act"), Ohio Rev.Code Ann. Ch. 1334, by failing to provide investors with a written disclosure document within ten days prior to the execution of the lease agreement and by making improper representations.[24] Defendants Kars and Larry Kars, P.C. argue, however, that by their explicit terms, these sections of the Protection Act

> In connection with the sale or lease of a business opportunity plan, no seller or broker shall:
> (A) Make any oral, written, or visual representation to a prospective purchaser concerning potential sales, income, or gross or net profit, unless:
> (1) The seller possesses data to substantiate the representation and provides the data in writing to the prospective purchaser at least ten business days prior to the execution of an agreement selling or leasing the business opportunity plan;
> (2) The written data provided by the seller discloses at least:
> (a) The length of time the seller has been selling or leasing the specific business opportunity plan offered;
> (b) The number of purchasers known to the seller to have made at least the same sales, income, or profit, from that business opportunity plan, and the percentage that number bears to the total number of purchases of that business opportunity plan;
> (c) The following notice in at least ten-point boldface type: "CAUTION
>
> Some business opportunity plans have earned this amount. There is no assurance you will do as well. If you rely upon our figures, you must accept the risk of not doing as well."
> (B) Make any false or misleading statement or engage in any deceptive or unconscionable act or practice;
> (C) Make any representation that is inconsistent with the disclosures required by section 1334.02 of the Revised Code and division (A) of this section;
> (D) Fail to maintain a complete set of books, records, and accounts with respect to each business opportunity plan sold or leased for a period of five years from the date an agreement selling or leasing the business opportunity plan is executed;

apply only to "sellers" or "brokers." The statute defines a "seller" as "a person who sells or leases a business opportunity plan," Ohio Rev.Code Ann. § 1334.01(A), and declares a "broker" to be "a person, other than a seller, who sells or leases, offers for sale or lease, or arranges for the sale or lease of a business opportunity plan for a commission, fee, or anything of value," Ohio Rev.Code Ann. § 1334.01(C). A "business opportunity plan" is "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services" under various conditions spelled out in the statute. Ohio Rev.Code Ann. § 1334.-01(D).

Defendants state that there appear to be no cases interpreting the terms "seller" or "broker" under the Protection Act or concerning the issue of possible aider and abettor liability under the statute, and the Court's own research has similarly failed to uncover any such case law. Defendants nonetheless conclude that the Protection Act's requirements are necessarily inapplicable to the alleged provision of legal and tax counsel with regard to the preparation, promotion, and sale of the investment contracts. In the absence of judicial delineation of or other guidance as to the contours of the Ohio statute, however, an exactly opposite conclusion would be equally plausible.

The Court concludes that any definitive interpretation of the Protection Act would be inappropriate at this juncture, as defendants' analysis of the statute and its applicability to the litigation now before the Court is rather cursory, plaintiffs have not supplied any papers discussing the issue, and the Court is wary of construing the scope of an Ohio state statute solely upon the limited information now available to it. Accordingly, defendants' motion to dismiss Count XI of the *Horn* Complaint is denied at this time.

### J. *Personal Jurisdiction*

Defendants FNEC, Grossman & Flask, and Robert D. Grossman, Jr. move to dismiss the *Horn* Complaint for lack of *in personam* jurisdiction.[25] Defendants argue that there is no personal jurisdiction over them in Ohio, where *Horn* was originally commenced. Defendants' contentions are groundless, however, as the necessary jurisdiction is provided by both the 1933 and 1934 Acts.

§ 22 of the 1933 Act allows suits to be brought "in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein." 15 U.S.C. § 77v. The Court held above that plaintiffs have stated a claim against each of the defendants for participating in the sale of securi-

(E) Accept, as a down payment, before the goods that are necessary to begin the business opportunity plan are delivered to the purchaser, a sum in excess of twenty percent of the initial payment, unless the sum in excess of twenty percent is placed in an escrow account in this state until the purchaser notifies the escrow agent, in writing, that the goods have been delivered;

(F) Accept, from a purchaser, money for goods promised the purchaser and then permit more than two weeks beyond the promised date for deliver of the goods to elapse without:

(1) Making shipment or delivery of the goods;

(2) Making a full refund of all sums paid by the customer;

(3) Advising the purchaser of the duration of an extended delay and offering to provide, within two weeks, a full refund of all sums paid by the purchaser;

(4) Furnishing similar goods of equal or greater value as a good faith substitute;

(G) Use the phrase "secured investment" or any other representation that implies that a prospective purchaser's initial payment is protected from loss if the only security is the value of the goods or services supplied to the purchaser by the seller or affiliated person;

(H) Represent that a purchaser's initial payment is secured in any manner or that the seller provides a buy-back arrangement unless the seller has, in the manner provided for by section 1334.04 of the Revised Code, obtained a surety bond or established a trust account.

25. Frank Giuffrida also joins in this motion to dismiss the *Horn* Complaint even though he has not specifically been named as a defendant in that action. Giuffrida apparently decided to join in the motion because he is named in the Consolidated Complaint as President and a major shareholder of FNEC.

ties in violation of § 12 of the Securities Act. *See supra* § III(C). Accordingly, as the *Horn* Complaint alleges that the securities at issue were sold in the Ohio district in which the action was commenced, defendants were subject to the jurisdiction of the United States District Court for the Southern District of Ohio, Eastern Division as participants in the sale of securities within that district.

 § 27 of the 1934 Act allows suit in any district in which any act or transaction violating the 1934 Act occurred, or in which the defendant is found, is an inhabitant, or transacts business. 15 U.S.C. § 78aa. The Court has held that plaintiffs have stated claims against each of the named defendants under § 10(b) of the 1934 Act, *see supra* § III(D), and the *Horn* Complaint adequately alleges that acts violating the 1934 Act took place in the district in which the suit was commenced. The 1934 Act thus provides an additional basis for personal jurisdiction.

The Court therefore denies defendants' motions to dismiss the *Horn* Complaint for lack of personal jurisdiction.

### K. *Conclusion as to Motions to Dismiss*

For the reasons set forth above, the Court denies defendants' motions to dismiss in their entirety with the single exception that the motions are granted insofar as defendants seek the dismissal of any claims for punitive damages under the Securities Act of 1933 and the Securities Exchange Act of 1934.

## IV. CLASS CERTIFICATION

The plaintiffs named in the Consolidated Complaint have moved for the certification of their lawsuit as a class action under Fed.R.Civ.P. 23(a) and 23(b)(3).[26] Specifically, plaintiffs seek that the Court certify three subclasses, namely:

(1) An "FELC Class" that will include all persons who invested in the Systems by purchasing investment contracts consisting of lease agreements with FELC and service agreements with any one or more of the Service Company Defendants between January 1, 1982 and May 4, 1984;

(2) A "1982 OEC Class" that will include all persons who invested in the Systems by purchasing investment contracts consisting of lease agreements with OEC and service agreements with any one or more of the Service Company Defendants during the calendar year 1982;

(3) A "1983 OEC Class" that will include all persons who invested in the Systems by purchasing investment contracts consisting of lease agreements with OEC and service agreements with any one or more of the Service Company Defendants between January 1, 1983 and May 4, 1984.

The Consolidated Complaint proposes plaintiffs Simlar, Dudek, Maciejewski, Kahler, and Waites as representatives of the FELC Class, plaintiff Falcone as representative of the 1982 OEC Class, and plaintiffs Berlage, Krick, and Burnham as representatives of the 1983 OEC Class.

Rule 23 provides, in relevant part:

*Rule 23. Class Actions*

*(a) Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*(b) Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other

---

**26.** The plaintiffs in the *Duco* and *Horn* cases apparently have not joined in this motion.

available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*(c) Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.*

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

(3) .... The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

(4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

Plaintiffs' action, therefore, may only be certified as a class action if the Court finds that it meets Rule 23(a)'s requirements of "numerosity," (23(a)(1)); "commonality" (23(a)(2)); "typicality" (23(a)(3)); and "adequacy" (23(a)(4)); and Rule 23(b)'s additional requirements that common questions "predominate" over any questions affecting only individual class members and that class treatment would be "superior" to other available methods of adjudication.

### A. *Numerosity*

 There can be no real question that plaintiffs' action meets Rule 23(a)(1)'s requirement of numerosity. The Consolidated Complaint alleges that each proposed class numbers in the thousands of members, and plaintiffs have appended as an exhibit to their "Plaintiffs' Reply to Defendants' Joint Response in Opposition to Plaintiffs' Motion for Class Certification" a list of the names and addresses of over two thousand known investors. The number of class members is more than sufficient to warrant class treatment of the investors' claims.

### B. *Typicality*

Defendants contend that plaintiffs fail to meet Rule 23(a)(3)'s requirement that the claims or defenses of the proposed representatives be typical of the claims or defenses of the class because some of the defenses that apply to the class members are atypical and vary from investor to investor. Defendants assert, for instance, that each of the plaintiffs who claimed a tax credit for the year he leased a System is subject to challenge as to his knowledge of the availability of the equipment on the day his tax return was filed. Defendants also challenge plaintiffs' compliance with Rule 23's typicality requirement on the grounds that other individual lawsuits,

such as *Duco* and *Horn,* contain claims not presented by the Consolidated Complaint and that the proposed class representatives learned of the Systems and the investment contracts through different brokers and other sources and relied on the judgment of different persons in deciding to invest in the Systems.

The Consolidated Complaint, however, describes a situation, confirmed by the deposition testimony of the various class representatives, in which investors relied upon and were purportedly misled by misrepresentations and omissions contained in standardized and virtually identical offering materials and related documents supplied to members of each of the suggested subclasses. Defendants' claims to the contrary, the consolidated actions now before the Court are *not* rooted in individualized dissatisfaction with disparate written or oral representations made to various separate investors by various differing persons, but in specific, organized, commonly-based and commonly-marketed schemes affecting particular classes of investors. Moreover, the existence of certain given factual discrepancies between the claims of class members is by no means a sufficient reason for a court to deny otherwise merited class certification. As *Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981), stated:

> Typicality refers to the nature of the claim of the class representative, and not to specific facts from which the claim rose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct. Factual differences will not defeat class certification where the various claims arise from the same legal theory. Thus, a difference in the amount of damage, date, size or manner of purchase, the type of purchaser, and even the specific document influencing the purchase

will not render the claim atypical in most securities actions. (Citations omitted).

*See also, e.g., Donaldson v. Pillsbury Co.,* 554 F.2d 825 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Oscar Gruss & Son v. Geon Industries, Inc.,* 75 F.R.D. 531 (S.D.N.Y.1977); H. Newberg, *Class Actions,* §§ 3.15, 22.11–22.13 (1985).

The proposed representatives' claims all have their genesis in the same alleged course of conduct which gives rise to the claims of each of the members of the three subclasses that they seek to represent and are based upon legal theories applicable to each and every member. The fact that certain investors may have become aware of problems with their investments during a given tax year or may have discussed the possibility of investing in the Systems with the brokers who first brought the existence of defendants' investment contracts to their attention by no means renders class representatives' claims so atypical as to defeat a motion for class certification. In like vein, the fact that certain other class members may have asserted causes of action not present in the Consolidated Complaint does not necessarily lead a court to conclude that the proposed class representatives claims are atypical: The Court finds that the claims put forth by the plaintiffs named in the Consolidated Complaint *do* appear to be typical; if anything, it is the counts in other complaints alleging violations of various specific state statutes that are atypical of the claims of nationwide classes of investors. Accordingly, the Court holds that the named plaintiffs satisfy 23(a)(3)'s requirement of typicality.

### C. *Adequacy*

Rule 23(a)(4)'s prerequisite that the representative parties fairly and adequately protect the interests of the class essentially requires that there be an absence of conflict between the interests of the class representatives and those of the class and an assurance that the litigation will be vigorously prosecuted. H. Newberg, *supra,* § 3.22, and cases cited therein. Defendants contend that the plaintiffs named in

the Consolidated Complaint are not suitably adequate representatives because of the "alarming unfamiliarity" they have shown as to the claims they are pursuing. Defendant's Joint Memorandum in Opposition to Plaintiffs' Motion for Class Action Certification at 14–16.

██ Defendants are correct that a proposed class representative's complete lack of personal knowledge regarding the litigation he is supposedly maintaining on behalf of a class of similarly situated persons can, under certain circumstances, deem the representative "inadequate." The cases defendants cite in support of their claim of inadequacy in the instant case, however, point up that Messrs. Waites, Falcone, and Burnham, the plaintiffs whom defendants specifically contend to be deficient, do not fall into this category of inadequate representatives. The proposed representatives in *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y.1978), for instance, did not meet with their attorney until after the basic groundwork of the action had already been laid, were completely unaware of various aspects of their complaint, and were able to identify only one of the more than dozen defendants in the case. *Id.* at 133–34. In *Levine v. Berg*, 79 F.R.D. 95 (S.D.N.Y. 1978), the plaintiff was unable to articulate, even after she finally studied the complaint the day before her deposition, how she and the other members of the purported class had been wronged and showed "an alarming adversity to unearthing the facts relevant to her claim." *Id.* at 97–98.

██ Defendants premise their claim of inadequacy upon plaintiffs' lack of familiarity not with this lawsuit but with the specifics of how the Systems actually worked or the relative merits of the different models offered. The Consolidated Complaint itself explicitly concedes that investors in the products defendants offered were wholly inexperienced in the field of energy conservation devices. In fact, defendants apparently marketed their products with just such inexperienced yet well-to-do investors in mind. The unfamiliarity of the named plaintiffs with technical aspects of the Systems is totally irrelevant to their adequacy as class representatives in this litigation. Defendants have completely failed to demonstrate any conflicts of interest that the proposed representatives have with other class members or any way in which the named plaintiffs have prosecuted or may in the future prosecute the lawsuit in anything but the most vigorous of manners.[27]

### D. *Commonality and Predominance*

Rule 23(a)(2) requires that in all class actions there be questions of law or fact common to the class. Rule 23(b)(3) contains the additional prerequisite that in suits seeking certification under that particular category of class actions common questions "predominate" over any questions affecting only individual members of the proposed class. Defendants argue that the necessary "commonality" and "predominance" is lacking, essentially because individual investors worked through different brokers, contracted with different service companies, purchased different Systems, had different objectives in making their investments, and relied upon varying written and oral representations.

██ However, as the Court has noted above in its discussion of defendants' challenge to the named plaintiffs' typicality, *see supra* § IV(B), this litigation is rooted in claims of misrepresentations and omissions contained in standardized materials supplied to a multitude of investors. The commonality provided by the alleged misstatements and omissions and defendants' purportedly fraudulent scheme far

---

**27.** In considering the "vigorous prosecution" aspect of the adequacy requirement, courts often focus primarily on counsel for the class rather than upon the individual named plaintiffs themselves. H. Newberg, *supra*, at § 3.42. Defendants have in no way questioned the manner in which plaintiffs' attorneys have so far handled this litigation nor their continued ability vigorously to prosecute this litigation, and the Court has seen nothing in counsels' representation of individual plaintiff and class interests to date that indicates any inability satisfactorily to handle this complex, multi-party matter.

outweighs any particular distinctions in the fact patterns surrounding the investments made by given class members. Additionally, the fact that questions as to certain specific class members' personal reliance on defendants' allegedly misleading materials and actions may ultimately have to be decided on an individual basis does not preclude certification of the proposed classes. Rule 23(b)(3) does not mandate the certification of a class only if *no* individual issues exist; rather, the predominance prerequisite requires merely that common issues provide the dominant core of a case. Any questions of individual reliance can be deferred until after the Court disposes of the question common to each of the classes. *E.g., Green,* 406 F.2d 291; *Blackie,* 524 F.2d 891; *Jennings Oil Co. v. Mobil Oil Corp.,* 80 F.R.D. 124 (S.D.N.Y.1978); *Dolgow v. Anderson,* 43 F.R.D. 472 (E.D.N.Y.1968); *see also,* H. Newberg, *supra* at §§ 4.25–.26, 22.47. Accordingly, the Court holds that plaintiffs' action meets the commonality and predominance requirements of Fed.R.Civ.P. 23(a)(2) and (b)(3).

### E. *Superiority*

■ Rule 23(b)(3) sets forth four factors to be considered in determining whether certification as a class action would be superior to other available methods of adjudication such as the procedural devices of joinder and intervention. These four factors, which are not intended to be exhaustive, *Rules Advisory Committee Notes to 1966 Amendments to Rule 23,* 39 F.R.D. 69, 104 (1966), are: (1) the interest of class members in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation already commenced by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) any management difficulties likely to be encountered if a class action is certified.

Factors such as those set forth in Rule 23(b)(3) have already been considered by the Judicial Panel on Multidistrict Litigation in determining whether to transfer the various pending federal cases involving the Systems to this Court, and the only element of superiority questioned by defendants is that of manageability. Defendants assert that the large number of parties involved, coupled with the complexity of the issues presented, render these cases unmanageable as a class action. The Court is appreciative of defendants' concern that its resources might be overburdened by the temporal, logistical, and jurisprudential difficulties inherent in this litigation. Nonetheless, the Court is confident that such obstacles can be conquered in stride and that, even considering the possibly formidable managerial challenges class treatment may entail, certification of the litigation as a class action encompassing the three subclasses proposed by plaintiffs is superior to any other available method for the fair and efficient adjudication of the controversy.

### F. *Challenges to Class Treatment of Specific Claims*

In addition to challenging plaintiffs' compliance with the various prerequisites of Fed.R.Civ.P. 23(a) and (b)(3), defendants argue that certain of plaintiffs' specific claims, namely their allegations under § 12(1) and (2) of the 1933 Act and the common law of fraud and negligence, are particularly inappropriate for class treatment. For the reasons discussed below, the Court rejects defendants' contention that Counts II–IV and VIII–XI of the Consolidated Complaint should not be certified as issues to be determined on a classwide basis.

#### 1. *§ 12(1) and (2)*

■ Defendants contend that the fact that individual investors will have to show compliance with § 13's limitation periods for § 12(1) and (2) claims, *see supra* § III(G), highlights the inappropriateness of class treatment of the counts arising from alleged violations of § 12. Courts have been nearly unanimous, however, in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action so long as the necessary commonality and, in a 23(b)(3) class action,

predominance, are otherwise present. *E.g., Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371 (11th Cir.1984); *Cameron v. E.M. Adams & Co.,* 547 F.2d 473 (9th Cir. 1976); *Green,* 406 F.2d at 301 n. 14; *Sargent v. Genesco, Inc.,* 75 F.R.D. 79 (M.D. Fla.1977); *Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480 (E.D.Pa.1977); *Ramsey v. Arata,* 406 F.Supp. 435 (N.D. Tex.1975); *Cohen v. District of Columbia National Bank,* 59 F.R.D. 84 (D.D.C.1972); *Dolgow,* 43 F.R.D. 472; *see generally,* H. Newberg, *supra,* at § 22.53. *But see Goldstein v. Regal Crest, Inc.,* 59 F.R.D. 396 (E.D.Pa.1973). § 13's possible effect on the viability of certain investors' claims for damages under § 12, therefore, does not bar class certification of the counts in the Consolidated Complaint asserting defendants' § 12 liability.

### 2. *Common-Law Claims*

As noted earlier in this opinion, *see supra* § III(F), the substantive law of the forums in which the individual actions now consolidated before this Court were originally commenced governs plaintiffs' common-law claims. Defendants argue that, as the elements necessary to prove a case of fraud or negligence vary from jurisdiction to jurisdiction, common issues of law or fact do not predominate with regard to plaintiffs' claims that defendants acted fraudulently or negligently.

Defendants' position is not without merit. Courts which have considered the issue of whether pendent common-law claims should be certified for class treatment in litigation arising primarily out of alleged securities law violations have differed in their answers to this problem. *Compare, e.g., In re Victor Technologies Securities Litigation,* 102 F.R.D. 53 (N.D.Cal.1984); *Dekro v. Stern Brothers & Co.,* 540 F.Supp. 406 (W.D.Mo.1982); and *In re Sax-*on *Securities Litigation,* [1983–84 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99, 961 (S.D.N.Y. February 23, 1984) [BB], *with In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583 (E.D.Mich.1985); *Zandman v. Joseph,* 102 F.R.D. 924 (N.D. Ind.1984); and *Elster v. Alexander,* 76 F.R.D. 440 (N.D.Ga.1977), *appeal dismissed,* 608 F.2d 196 (5th Cir.1979). Although the question is a close one, the Court is of the view that, at least in the context of the cases at bar, the rationale of those courts which have certified such classes is sounder than that which has led other courts to draw an opposite conclusion as to the propriety of certification. Plaintiffs' common-law claims arise out of the same purportedly fraudulent scheme and alleged misrepresentations and omissions that underlie plaintiffs' federal causes of actions. Much of the evidence necessary to establish defendants' liability under federal law will thus be equally necessary for plaintiffs' common-law claims. Just as in *Victor Technologies,* plaintiffs have not alleged any separate acts of fraud or negligent as grounds for their common-law fraud and negligent misrepresentation claims; rather, their state law claims are predicated upon the same fraudulent acts and material misrepresentations and omissions that underlie their federal claims. *See* 102 F.R.D. at 59. Additionally, despite possible specific deviations in the laws of different jurisdictions, it is not at all clear to the Court that any variations in the jurisprudence of fraud and negligence are such as to outweigh the commonality of legal and factual issues otherwise present in this litigation. The Court therefore finds that the required predominance of common issues is present with regard to not only plaintiffs' federal claims, but their common-law claims as well.[28]

---

**28.** If at a later stage in the litigation it becomes apparent that significant discrepancies in the relevant state laws of fraud and negligence in fact exist and may have an actual effect on the viability of given investors' claims against particular defendants, this situation can be handled by the procedural device of subclassing with regard to the common-law claims or even, if no other alternative appears feasible, decertification of the classes with respect to the common-law allegations. The Court need not engage at this point in speculation as to circumstances that might lead to such modification of its current ruling.

Defendants also contend that the fact that the laws of different jurisdictions may have to be applied to various investors' common-law fraud and negligent claims renders class treatment of these claims particularly unmanageable. The Court does not perceive any insurmountable managerial difficulties that would be presented by class certification of these claims over and above the general challenge incumbent in judicial supervision of multidistrict litigation.

### G. Conclusion as to Class Certification

For the reasons stated above, the Court finds that plaintiffs have satisfied the requirements of Fed.R.Civ.P. 23, and hereby certifies the three subclasses suggested by plaintiffs and approves the proposed individual named plaintiffs as representatives of the particular classes for which they were proposed.

## V. ADMINISTRATIVE MATTERS

### A. Attorney Withdrawals and Substitutions

The Court has received a number of motions for withdrawal or substitution of attorneys. After considering several of these motions, the Court adopted the policy that determination of such requests would be deferred until after the motions to dismiss were decided. These motions now having been resolved, the Court hereby grants, after consideration of the papers provided to the Court, the motions to withdraw of the following attorneys:

1. Monteverde, Hemphill, Maschmeyer & Obert; attorneys for defendants Weatherman and Tobin.

2. Miller, Johnson, Snell & Cummiskey; attorneys for defendants Weatherman and Tobin.

3. Clausen, Miller, Gorman, Caffrey & Witous; attorneys for defendants Weatherman and Tobin.

4. Alston & Bird; attorneys for defendants Weatherman and Tobin.

5. Lawrence Bunin; attorney for defendants Henry W. Kuklinski Enterprises, Inc. and Henry W. Kuklinski.

6. Michael E. Jackson, Philip T. Crenshaw, and Crenshaw & Crenshaw; attorneys for M–Square, Inc.[29]

7. Cholette, Perkins, & Buchanan; attorneys for defendant Zayle A. Bernstein.

8. Robert Weber; attorney for defendants OEC, Medina, Oster, and Carstow.

9. Loomis, Ewert, Ederer, Parsley, Davis & Gotting; attorneys for defendant Day & Zimmerman.

10. Arnold Kanter, Judy L. Smith, and Altheimer & Gray; attorneys for defendant Minuteman.

11. Schneider & Graf; attorneys for Delcor Industries, Inc.[30]

12. D'Ancona & Pflaum; attorneys for defendant Kozich. The law firm of Eaton & Van Winkle is to be substituted as new counsel for Kozich.

Any further applications for attorney withdrawal or substitution should be filed with the Court by no later than September 8, 1986. The Court will subject any applications received after this date to extremely close scrutiny.

### B. Conference

As the motions to dismiss and for class certification have now been resolved, a conference between the Court and the parties will now be fruitful. Liaison counsel for plaintiffs and attorneys for defendants who wish to be present at such a conference are hereby notified that the conference will be held at 9:00 A.M., August 28, 1986, in Courtroom C of the United States Courthouse, Uniondale, New York. Topics to be discussed will include the progress of pretrial discovery and the form and content of

---

**29.** M–Square, Inc. was originally designated a party defendant in *Waites,* but has not been named as a defendant in the Consolidated Complaint.

**30.** As is the case with M–Square, Inc., *see supra* n. 29, Delcor Industries, Inc. was named as a defendant in *Waites* but not in the Consolidated Complaint.

notice that should be sent to members of the three subclasses. Parties are to supply to the Court, by no later than August 22, 1986, a synopsis of discovery activity that has already transpired, a proposed schedule for all future discovery, and proposed class notices.

## VI. CONCLUSION

For the reasons discussed in this Memorandum and Order:

1. Defendants' motions to dismiss are denied, except that the motions are granted to the extent that plaintiffs seek punitive damages under the Securities Act of 1933 and the Securities Exchange Act of 1934;

2. Plaintiffs' motion for class certification is granted. Accordingly, the Court hereby certifies the following three subclasses with each subclass to be represented by the indicated named plaintiffs:

| Class Name | Definition of Class | Representatives |
| --- | --- | --- |
| FELC Class | All persons who invested in the Systems by purchasing investment contracts consisting of lease agreements with FELC and service agreements with any one or more of the Service Company Defendants between January 1, 1982 and May 4, 1984 | Simlar, Dudek, Maciejewski, Kahler, and Waites |
| 1982 OEC Class | All persons who invested in the Systems by purchasing investment contracts consisting of lease agreements with OEC and service agreements with any one or more of the Service Company Defendants during the calendar year 1982 | Falcone |
| 1983 OEC Class | All persons who invested in the Systems by purchasing investment contracts consisting of lease agreements with OEC and service agreements with any one or more of the Service Company Defendants between January 1, 1983 and May 4, 1984 | Berlage, Krick and Burnham |

3. Attorneys' motions for withdrawal or substitution are granted as indicated in the Court's opinion. Any further motions for attorney withdrawal or substitution are to be filed with the Court by no later than September 8, 1986.

4. Parties are to submit, by August 22, 1986, a synopsis of discovery activity that has already transpired, a proposed schedule for all future discovery, and proposed class notices.

5. A conference with the Court shall be held at 9:00 A.M. on August 28, 1986.

SO ORDERED.